Filed 2/24/21  P. v. Vang CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KER VANG,<br><br>    Defendant and Appellant. | C081374<br><br>(Super. Ct. No. CM042013) |

Defendant Ker Vang shot at two vehicles from his vehicle while traveling on a highway.  A jury found defendant guilty of second degree murder of Jar Lee, attempted murder of Cheng Thao, and various other assault-related crimes against Lee, Thao, and two of their friends.  The jury further found true various enhancement allegations, including allegations that defendant personally used a firearm in the commission of the offenses.  The trial court sentenced defendant to the maximum term:  a determinate term of 21 years plus life, with a minimum parole eligibility of 65 years.

1

On appeal, defendant: (1) argues the trial court violated his constitutional right to due process when it told the jury it could consider the prosecutor's comment regarding a possible witness's failure to testify in assessing defendant's guilt; (2) requests we review an in camera hearing transcript in which the trial court denied defendant's pretrial request for identification of a confidential informant; (3) argues errors made by the trial court with respect to the foregoing two arguments were cumulatively prejudicial; (4) argues we must remand this case for resentencing to allow the trial court to exercise its discretion as provided in recently enacted amendments to the law after judgment; and (5) argues the second degree murder conviction as to Lee is inconsistent with the attempted murder conviction as to Thao in violation of his due process rights.

We grant defendant's request to review the transcript of the in camera hearing and otherwise affirm the judgment, but remand for the trial court to exercise its discretion as to whether to strike the enhancements imposed pursuant to Penal Code[1] sections 12022.53 and 12022.5, which added 56 years and 8 months to his sentence, pursuant to Senate Bill No. 620 (2017-2018 Reg. Sess.).

## FACTUAL AND PROCEDURAL BACKGROUND

At trial, the People called as witnesses the three living victims and various deputies/investigators involved in the case, including Butte County Sheriff's Deputy Silver Paley, who testified to an October 4, 2014, shooting and Hmong Nation Society (Gang) activity in Chico.

## I

### *The Gang Membership And Incident Preceding The Shooting*

Deputy Paley, who previously worked in the gang unit of the Butte County Sheriff's Department, testified at trial that the Gang is a gang with active members in the

---

[1] All further section references are to the Penal Code unless otherwise specified.

Oroville area; they consider the Oroville area their "turf." Gang members are known to commit various crimes, including assaults with a deadly weapon, murder, and drive-by shootings.

On October 4, 2014, rival gang members from Yuba City showed up during a Hmong New Year celebration in Chico, leading to a confrontation that ended in a vehicle-to-vehicle shooting. During the shooting, one Gang member accidentally injured another Gang member. Five Gang members were arrested as a result of the incident, but no members of the rival gang were. Though defendant is not known to have been personally involved in the incident, the incident would have had significance within the Gang community in Oroville, because it was viewed as disrespectful for the other gang members to show up in their area, and it made the Gang look weak when Gang members were arrested while the other gang's members were not. Defendant admits he is a gangster and Paley believes defendant is an active participant in the Gang.

The shooting victims in this case do not appear to have any involvement in any gang, though two of the victims have a distant cousin relationship with the Gang member who was injured on October 4, 2014.

## II

### *The Shooting And The Victims' Injuries*

In the early hours of October 6, 2014, brothers Long Yang and Kue Yang,[2] Lee and Thao were hanging out. They decided to go to the Yangs' other brother's home. Long drove a silver truck, and Kue rode with him. Thao drove his white Honda hatchback, and Lee rode with him. They stopped at a FoodMaxx to get some beer.

---

[2] Due to the commonality of the Yang last name, we hereafter refer to Long Yang and Kue Yang by their first names. We collectively refer to the brothers as the Yangs. No disrespect is intended.

3

Video surveillance footage from the FoodMaxx parking lot shows defendant exiting the FoodMaxx with an Asian woman, Lory Xiong, his girlfriend. Xiong and defendant took their cart to a white Honda hatchback with a black hood that was parked in the parking lot. While defendant was returning the shopping cart, Xiong got into the driver's side of the car, and Long's truck and Thao's Honda civic pulled into the lot. Thao testified at trial that he noticed a car that looked like his, a white hatchback, in the parking lot. Long got out of the truck and walked into the store as defendant returned to his car and got into the passenger's side. Defendant then stepped out of the passenger side of his car, walked around the car, and got into the driver's side. The video footage does not show Xiong getting out of the car. After about a minute, defendant's car left the lot, driving past the truck and Thao's car while tapping its brakes. Long left the store approximately five minutes later, placed his purchases in the back of his truck, and got in his truck to leave.

Long, Kue, Lee, and Thao then left the parking lot to continue to the Yangs' brother's home. They planned to travel on Highway 70 and exit on Grand. At trial, Thao testified the car he had noticed in the parking lot, the white hatchback, was following them as they left the lot and appeared to be stalking them. Long drove in front of Thao as they entered the highway. They traveled north on the highway.

About the time they reached the Grand off-ramp, someone shot at Long and Kue. They heard three gunshots and the driver's side window of the truck shattered. Neither was injured. The driver of the white car who was driving fast, cut them off, and left the highway on Grand. Because Thao drove a white car and had been following them, at first both brothers assumed the car that had cut them off had been Thao. Long pulled the truck over and stopped near a taxi. Long got out of the truck to tell the taxi driver that someone had shot at them; he saw bullet holes in the side of the truck.

At the scene of these events, Long spoke with Oroville Police Detective Shane Carpenter and described leaving FoodMaxx, driving to and then traveling north onto

4

Highway 70, hearing gunshots and his driver's window shattering, and then seeing a white Civic speed past him on the Grand exit. Long also related these events to Butte County Sheriff's Detective Jason Miller later that day.

Thao testified he was driving when he heard a pounding noise and a screech. A bullet went through his jaw. Thao noticed Lee had been shot and tried to communicate with him, shaking and nudging him, but he received no response and heard Lee make a gasp for air. Thao got in the fast lane and drove as fast as he could to a hospital in Chico.

At trial, Thao reported he did not see who shot him. However, Butte County Deputy Sheriff's Officer Miah Basden testified Thao told a different story in the hospital on October 6, 2014. At the time of the hospital interview, Thao could not speak and communicated with head nods. Another detective interviewed Thao while Basden recorded the interview, and the recording was shared with the jury. According to Basden, Thao indicated he did not know who shot him. However, he also indicated he had seen the vehicle the shooter was in, and he indicated "no" when asked if the vehicle was a truck, van, or sport utility vehicle. He indicated the shooter was in a white car, similar to his, that the car had a black hood, and that it was the car he saw in the FoodMaxx parking lot. He indicated the car had followed him from the FoodMaxx parking lot to Highway 70 and he recalled there being only one person in the car.

Thao had surgery to repair his jaw injury and remained in the hospital for two to three weeks. He had to go to therapy to learn to speak again and could not eat a normal diet for about month after he left the hospital. At the time of trial, he still felt numbness in his jaw and had lost two teeth. Lee was injured by two bullets that entered on his left -- the direction of the driver's side -- and traveled right. The bullet that struck his chest was nonlife threatening. The gunshot wound to Lee's head killed him.

### III

*Defendant's Versions Of The Events*

At trial, the People presented defendant's interview with law enforcement officers.

5

On October 6, 2014, Butte County Detectives Chris D'Amato and Rowdy Freeman interviewed defendant at the main sheriff's office.

Defendant initially told a story about going to FoodMaxx to get groceries with his girlfriend at about 1:30 a.m., leaving the store, loading the groceries in the car, then returning home. At first, he said nothing out of the ordinary occurred. He said it was a normal shopping night and he took Highway 70 north home. Though Xiong was initially going to drive home, they decided defendant would because she is not good with a stick shift; so, she slid over and defendant got in the driver's seat. When asked about the shooting, defendant indicated he knew nothing about the shooting other than what he had heard on the news or Facebook.

Later, defendant's story changed. "He explained that he saw a vehicle, something similar to a Honda Pilot, drive past him, come alongside the two victim vehicles, and open fire on the vehicles." He said he could smell the gunpowder from the gun and shell casings were hitting his car. When asked, he insisted neither he nor Xiong was the shooter.

A little over an hour into the interview, defendant's story changed a second time. He said that, while in the parking lot, he saw a group of Asian males and they gave him a "gangster" look, but he continued to insist someone in a Honda, Pilot shot at the victims' cars. Soon, however, he said he knew the driver of the Pilot. He said it was driven by Yang Thao, a friend he had called to come check out the unfamiliar men -- the victims -- he saw in the FoodMaxx parking lot. As he told this version of events, defendant said he was very worried about being labeled a snitch. Defendant said he was surprised when Yang Thao shot at the victims' cars, and he had not expected that to happen. Later, when returning to this story, defendant said the driver of the Pilot was Steve Thao.

Eventually, defendant admitted to perpetrating the shooting and acknowledged there was no Pilot. He said he originally fired three shots and then fired three more. When asked why he shot the victims, defendant said he could not let people come into his

6

town and look at him like that, and rhetorically asked "what am I gangster for?" Defendant, however, seemed unsure of what kind of gun he used. He said he threw the gun out the window of his car near Oroville Dam.

Defendant eventually reversed his admission and returned to the story about Steven Thao.

In all, defendant gave four fundamentally different versions of the events. First, he went home and did not see anything. Second, he saw the shooting but had no part in it. Third, he saw the victims and called someone to check on them; then, outside of his control, that person shot the victims. Finally, defendant said he shot them.

The detectives repeatedly asked defendant if his girlfriend, Xiong, was the shooter and he said she was not.

IV

*Other Evidence*

In addition to testifying to events they learned watching surveillance footage and interviewing victims, investigators recounted some of the findings they made after examining defendant's car and cell phone. Jonathon Angle, an investigator for the Butte County District Attorney's Office, testified he was able to sit in the driver's seat while an evidence tech sat in the passenger seat with her seat down, and with his left hand on the lower part of the steering wheel and his foot on the gas, he was able to lean with his handgun pointed out the window of the car. Brady Spas, a senior criminalist with the Department of Justice Crime Laboratories in Chico, testified the samples she took from the car did not indicate the presence of gun residue, but she said she would not expect to find residue in a car when a gun is fired out of the window while traveling 60 miles per hour, because any residue from the gun would likely blow away. Detective D'Amato testified he checked defendant's phone and did not see any calls made between 1 a.m. and 2 a.m. on October 6, 2014. He also looked for text messages and did not find any.

7

The defense called Annedore Rubalcava, who reported she was driving home around 2 a.m. on October 6, 2014, when she heard "bam, bam, bam" and saw flashes coming from the vicinity of a vehicle that was perhaps a van or sport utility vehicle and was "silverish."  The defense also called Stephanie Guyer, who was the cab driver who pulled over and interacted with the Yangs.  She indicated that when she was pulled over, she saw a white car get off the freeway, and a gray car akin to a sport utility vehicle pass by as she spoke to Long.  The defense also called Dr. Paul Good, a clinical and forensic psychologist, who testified about various factors that may have led defendant to give a false confession when detectives interviewed him.

Neither party called Xiong as a witness.

V

*Charges Against Defendant*

The People charged defendant with murder of Lee, attempted murder of Thao, three counts of assault with a firearm for firing at Thao and the Yangs, and two counts of shooting at an occupied vehicle.  Appended to the murder and attempted murder counts were allegations that defendant personally and intentionally discharged a firearm, causing great bodily harm or death pursuant to section 12022.53, subdivision (d), and section 12022.53 enhancements with lesser sentences.

Appended to the attempted murder and assault with firearm charges as to Thao were enhancement allegations that defendant's actions caused Thao great bodily injury pursuant to section 12022.7, subdivision (a).  Appended to all charges except the two for shooting at an occupied vehicle, were enhancement allegations that in committing the crimes, defendant personally used a firearm, as defined in sections 1203.6, subdivision (a)(1), and 12022.5, subdivision (a).  Appended to all charges except the murder and attempted murder charges were enhancement allegations that alleged defendant committed the crimes for the benefit of a criminal street gang.  With respect to

8

the murder charge, the court instructed the jury that if it found defendant not guilty of first degree murder, it could find him guilty of second degree murder.

VI

*The Verdicts And Sentencing*

The jury found defendant guilty on every charge, though on the murder charge, it found him not guilty of first degree murder but guilty of second degree murder, and it found all alleged enhancements true. Defendant filed a motion for retrial, which was denied. The court pronounced its judgment and sentence on February 11, 2016.

With respect to the victims in Thao's car, the trial court sentenced defendant to 15 years to life on the second degree murder count, with an enhancement of 25 years to life for the section 12022.53, subdivision (d) finding, and stayed any lesser enhancements, for a total of 40 years to life. The court then imposed the upper term on all other determinate charges. The court sentenced defendant to nine years for the attempted murder of Thao, with an enhancement of 25 years to life for the section 12022.53, subdivision (d), finding, and stayed any lesser enhancements for a determinate term of nine years plus life, with a minimum parole eligibility at 25 years. The court then stayed the additional counts -- one for assault with a firearm and one for shooting at a moving vehicle -- with respect to the victims in Thao's car pursuant to section 654, subdivision (a).

With respect to the Longs, on both assault charges, the court sentenced defendant to the subordinate term of one year, three years and four months for the firearm enhancement pursuant to section 12022.5, and one year and four months for the street terrorism enhancement, for an aggregate determinate sentence of six years for each victim, or 12 years for both. The court then stayed the assault with a firearm count as to the Yangs pursuant to section 654, subdivision (a).

In total, the court sentenced defendant to 21 years on the determinate term plus life with a minimum parole eligibility of 65 years.

9

At the sentencing hearing, the court observed that defendant was statutorily ineligible for probation, but that even if he "were eligible for a grant of probation, he would not be considered a suitable candidate. The Defendant used a weapon against particularly vulnerable victims during the commission of the offense. He was an active participant in the crime. The offense was committed in the furtherance of a criminal street gang. By virtue of his conduct in this case, the Defendant has revealed himself to be a violent, dangerous individual who, if not incarcerated, would be a danger and pose a threat to our community."

Additionally, in reaching the term for the determinate counts, other than murder, the court stated, "[i]t is noted the Defendant has no prior record of criminal convictions. However, the Defendant's actions involved great violence and a high degree of callousness. The Defendant fired multiple rounds from his moving vehicle toward the victims' moving vehicles. There were at least two other vehicles on the freeway at the time of the shooting, one of which was a taxi transporting passengers. Those innocent motorists were subject to being struck by stray and ricocheted bullets, as well as potentially being injured if the victims had lost control of their vehicles due to their injuries. As such, the Defendant's actions posed a danger, and showed a general disregard for the lives of not only the direct victims, but the general public as well.

"The drivers of the two cars, Mr. Thao and Long Yang, would be considered particularly vulnerable in that they were drivers and were traveling on the freeway at the time of the shooting at a high rate speed. They had a limited ability to take evasive action to avoid the shooting or to defend themselves. All of these victims are considered vulnerable. And none of them had engaged in any conflict with the Defendant prior to the offenses, and were likely taken by surprise when he began shooting at them.

"The Defendant's decision-making with regard to this matter, particularly his willingness to shoot at strangers based upon perceived disrespect, or his incorrect assumption that they were rival gang members, indicate that this Defendant is a danger to

10

society if he is not incarcerated. Given those factors, an upper term on all the determinant charges appears to be appropriate."

Defendant timely filed this appeal.

DISCUSSION

I

*The Trial Court Did Not Err In Correcting Its Ruling On The*

*Defense Objection To Statements Made During The People's Rebuttal*

In closing argument, the People said, "this case was about a man who viewed the world through gang goggles. What we are referring to . . . is how the defendant's gang involvement shapes his perceptions. [¶] What happened that night is he has this perception that the young men who were hurt in this case, the . . . young men who were shot at in this case, were involved in a rival gang because he didn't recognize them. And he acts on that assumption. [¶] He acts like a predator. He waits for them. He follows them. And then, when the time is right, he pounces and launches his attack." The People then reviewed the evidence presented and argued how it had proven their case.

In response, the defense argued nothing the prosecution had offered proved defendant was the shooter. More specifically, the defense noted that two witnesses at trial, and defendant during his interview, made reference to seeing some type of silver Honda Pilot, van, or sport utility vehicle either as the source of the shooting or on Highway 70 that night. The defense noted that even if the jury were to accept the shooter was in "the car with the black hood[, w]ell we know there were two people in that car. And we know that there's no gunshot residue in that car. [¶] Now the explanation about the hand being out the window, I submit to you, most logically for that to be true, if that were the case, a passenger would be the shooter. And we know there were two people in that vehicle." The defense argued that to the extent defendant confessed to the crimes during his interview, that confession had been false or coerced.

11

In rebuttal, the People addressed the defense's suggestion that Xiong may have been the shooter: "There was a suggestion by the defense that Lory's the shooter. Well, that completely contradicts what Mr. Vang said. Mr. Vang said she's not. [¶] And the one thing that I was wondering in this case is the defense elected to put a defense on. That's fine. They called Mr. Good. That's fine. They called people who saw portions of this shooting. They never called Lory, defendant's girlfriend." The defense objected to this stating, "[t]hat's burden shifting."

The court initially sustained the objection and instructed the jury, "[y]ou'll ignore that statement." Immediately thereafter, the People asked to be heard on the court's ruling on the objection, and the court called the attorneys to the bench for a conference. The People argued, "[i]t's not burden-shifting. It's pointing out failure to call a logical witness. The defendant in his own interview says, '[m]y only witness is Lory.' [¶] They have elected not to call her." When the court indicated it would reverse its ruling, the People said, "I request you simply instruct the jury you reverse the ruling and they can consider it."

The court then instructed the jury, "I had ruled the objection was sustained. I'm now reversing that ruling. [¶] You may consider the fact that Lory did not testify." Later, outside the presence of the jury, the court clarified its ruling on the objection was "based upon the fact that the defense brought up the issue that Lory was the shooter or suggested to the jury that Lory was the shooter."

Defendant argues the trial court violated his Fourteenth Amendment due process rights by "[s]ingling out Lory Xiong's [f]ailure to [t]estify as a [f]act [t]hat the [j]ury [c]ould [c]onsider in [a]ssessing [defendant's g]uilt." We disagree.

Defendant is not asking this court to find that the trial court's ruling was wrong; instead, defendant takes the position that the comment is effectively a jury instruction and because the court "made no similar remark about any missing prosecution witness or evidence," it was "singling out [Xiong's] missing testimony" and "conveyed the message

that the defense's failure to call her was a uniquely important deficit in the case." But in advancing this argument, defendant expects us to consider the court's statement outside the context within which it was made. The defense suggested in argument that defendant's passenger, Xiong, may have been the shooter. When the prosecutor met that argument by asking rhetorically why, if that were so, the defense did not call her as a witness, defendant elected to object to the People's argument. The court said, "[y]ou'll ignore that statement," when it sustained the objection, and when it reversed itself it indicated its final ruling was the reverse of what it had been, i.e., that the jury was not required to ignore that Xiong did not testify.

The court was not "singling out" the absence of Xiong's testimony as compared to other potential witnesses in the case that the prosecution might have called, it was doing no more than allowing the prosecution to fairly meet defendant's argument. Defendant raised the issue of Xiong's involvement, if any, in the shooting and the prosecutor was merely pointing out an arguable weakness in the theory defendant was arguing.

There was no error.

## II

### *The Confidential Informant's Identity*

Defendant requests we review the in camera trial court proceedings regarding defendant's pretrial motion to obtain the identity of a confidential informant. The People agree the review is appropriate. We grant defendant's request and, having reviewed the transcript of the hearing, we conclude the trial court acted within its discretion in denying the motion.

### A

### *Additional Facts*

The jury trial in this case began on November 2, 2015. On September 8, 2015, roughly two months prior to the start of trial, the People supplied defendant's counsel with discovery packets. One of the packets contained a report prepared by Deputy Paley.

13

According to the report, Deputy Paley had had multiple conversations with a confidential informant who claimed to have a close relationship with Gang members in the Oroville area. The confidential informant told Deputy Paley he/she had heard that defendant was not the only individual involved in the shootings at issue in this case, and two other individuals, S. V. and F. X., had also been involved in the crime. The confidential informant said he/she had heard S. V. was the driver of an additional vehicle involved in the shooting, while F. X. was the front-seat passenger. The confidential informant indicated he/she had heard thirdhand that F. X. may have been the shooter from S. V.'s vehicle. The confidential informant could not identify the person from whom he/she had received this information; indeed, he/she could provide no further information, and said he/she had no personal knowledge of the incident. Rather, the confidential informant said the information had been circulated at the street level by Gang members. Deputy Paley was familiar with F. X. and indicated in his report that F. X. is a documented Gang member, and the confidential informant told Deputy Paley that S. V. is a gang member as well.

During a traffic stop, Deputy Paley located S. V., who had attempted to conceal his identity by giving a false name. S. V. admitted to trying to conceal his name, but would not explain why he had done so. Deputy Paley spoke with S. V. about the murder investigation at issue in this case, and S. V. denied any involvement in the crime. S. V. denied knowing who F. X., defendant, and Xiong were, and he was otherwise "very uncooperative." S. V. said he was homeless and could not be reached at any given address.

After receiving the information about S. V. and F. X., defendant filed a motion to require the People to disclose the identity of the confidential informant or to dismiss the charges against defendant. Defendant argued the confidential informant was a material witness on the issue of guilt or innocence in the matter and there was a reasonable probability nondisclosure of his/her identity would deprive defendant of a fair trial.

14

In their opposition, the People said an officer having work done on his personal vehicle was told by the shop owner that he had heard S. V. was the gunman and drives a silver Pilot. Another investigator later spoke with the shop owner, who told him the same thing, and the shop owner said had heard the story "on the street."

Following an initial hearing by the parties on the motion to disclose, the trial court set an in camera hearing. Deputy District Attorney Mark Murphy, Deputy Paley, and court staff appeared at the hearing. The court denied the motion.

B

*The Trial Court Did Not Abuse Its Discretion In Denying The Motion To Disclose*

Evidence Code section 1041, subdivision (a)(2), grants the government a privilege not to disclose the identity of a confidential informant when "the necessity for preserving the confidentiality of [the informer's] identity outweighs the necessity for disclosure in the interest of justice." Under Evidence Code section 1041, the state's interest in preserving confidentiality must be balanced against the defendant's right to due process and a fair trial. (*People v. Lee* (1985) 164 Cal.App.3d 830, 835.) That balance hinges on whether the informant is a potential material witness on the issue of guilt. (*People v. Bradley* (2017) 7 Cal.App.5th 607, 626)

As we laid out in *Bradley*, "[t]he trial court determines an informant's materiality pursuant to procedures provided by [Evidence Code] section 1042. That statute requires a court to convene a hearing outside the presence of the jury on a party's demand for disclosure of an informant's identity. If, during the hearing, the People claim the nondisclosure privilege or a person authorized to claim the privilege refuses to answer any questions because the answer might disclose an informant's identity, the prosecution may request the court to convene an in camera hearing. At that hearing, the prosecution may offer evidence that discloses the informant's identity 'to aid the court in its determination whether there is a reasonable possibility that nondisclosure might deprive the defendant of a fair trial.' ([Evid. Code,] § 1042, subd. (d).)

15

"After the hearings, the court 'shall not order disclosure, nor strike the testimony of the witness who invokes the privilege, nor dismiss the criminal proceeding, if the party offering the witness refuses to disclose the identity of the informant, unless, based upon the evidence presented at . . . [the hearings], the court concludes that there is a reasonable possibility that nondisclosure might deprive the defendant of a fair trial.' ([Evid. Code,] § 1042, subd. (d).) '[W]hen an *in camera* hearing has been held and the trial court has reasonably concluded, as in the instant case, that the informant does not have knowledge of facts that would tend to exculpate the defendant, disclosure of the identity of the informer is prohibited by . . . [Evidence Code] section 1042, subdivision (d), since the public entity has invoked the privilege pursuant to [Evidence Code] section 1041.' " (*People v. Bradley*, *supra*, 7 Cal.App.5th at pp. 620-621.)

The trial court complied with Evidence Code section 1042's procedures. Thus, as in *Bradley*, we "are concerned only with the court's decision." (*People v. Bradley*, *supra*, 7 Cal.App.5th at p. 621.) In *Bradley* we said that, in these instances, we "review the trial court's ruling for an abuse of discretion." (*Ibid.*) Citing decisions preceding *Bradley*, defendant argues we should instead apply de novo review. For the reasons set forth in *Bradley*, we agree the proper standard of review is abuse of discretion.

Applying the abuse of discretion standard articulated in *Bradley*, we find no error. The confidential informant was not a percipient witness and could not provide any information to the defense that was not already known on the street and, more importantly, known to the defense. The confidential informant did not have any further exculpatory information. Indeed, the confidential informant was unable to identify the source of the information he/she provided and indicated anything he/she had heard simply came from the rumor mill among the Gang community.

## III

### *There Is No Cumulative Prejudice*

Defendant argues the preceding purported errors permeated his trial and "the combined effect of the errors was prejudicial under any standard," requiring reversal of his convictions. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) Because we concluded no error occurred with regard to defendant's preceding arguments, there was no cumulative error.

## IV

### *Remand Is Appropriate For The Trial Court To Exercise Its Discretion*
### *Under Postjudgment Amendments To Sentencing Statutes*

Defendant argues we must remand this case to allow the trial court to exercise its discretion whether to strike the sections 12022.53 and 12022.5 firearm enhancements imposed, because the law imposing those enhancements was amended after judgment to allow trial courts to exercise such discretion, and the amended law applies retroactively to the sentence imposed in this case. These sentence enhancements -- two 25-year terms under section 12022.53, subdivision (d) and two three-year-and-four-month terms under section 12022.5 -- account for 56 years and eight months of defendant's sentence before he would be eligible for parole.

The People agree the amended statutes apply retroactively in this case but contend that remand in not necessary because there is nothing in the record to suggest the trial court would exercise its discretion to strike the enhancements if given the opportunity to do so. We agree with the parties that the statutes apply retroactively; we further agree with defendant that he should be given the opportunity to present his arguments to the trial court on remand.

17

A

*The Amended Statutes Apply Retroactively*

Section 12022.53, subdivision (d), adds a 25-year consecutive prison term to the sentence of any person who, during the commission of a murder or attempted murder, "personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice." Likewise, section 12022.5, subdivision (a), adds additional time to the sentence of a person convicted of a felony when it is found true that the person personally used a firearm in the commission of the felony.

When the trial court entered judgment in this matter, it had no discretion to strike enhancements imposed pursuant to sections 12022.5 and 12022.53. (See former § 12022.5, subd. (c), as added by Stats. 2010, ch. 711, § 5 ["Notwithstanding Section 1385 or any other provisions of law, the court shall not strike an allegation under this section or a finding bringing a person within the provisions of this section"]; former § 12022.53, subd. (h), as added by Stats. 2010, ch. 711, § 5 [same].)

After the trial court sentenced defendant, the Legislature amended sections 12022.5, subdivision (c), and 12022.53, subdivision (h), via Senate Bill No. 620 to allow a trial court to, "in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement" that either statute required. (See Stats. 2017, ch. 682, §§ 1, 2.) The authority to strike or dismiss a finding that a person used a firearm in the commission of an offense extends to "any resentencing that may occur pursuant to any other law." (§§ 12022.5, subd. (c), 12022.53, subd. (h).)

As articulated by our Supreme Court in *In re Estrada* (1965) 63 Cal.2d 740, 742, when a statute is amended that mitigates a punishment after the prohibited act is committed but before final judgment, the "punishment provided by the amendatory act should be imposed." In *People v. Francis* (1969) 71 Cal.2d 66, 76, our Supreme Court applied *Estrada* to circumstances in which "the amendment does not revoke one penalty

18

and provide for a lesser one but rather vests in the trial court discretion to impose either the same penalty as under the former law or a lesser penalty." In *Francis*, our Supreme Court also clarified that an amended penalty statute applies in instances in which the amendment occurred after sentencing in the trial court but before the case was resolved on appeal. (*Francis*, at p. 77.)

Here, the amendments to subdivision (c) of section 12022.5 and subdivision (h) of section 12022.53 "necessarily reflect[] a legislative determination that the previous bar on striking firearm enhancements was too severe, and that trial courts should instead have the power to strike those enhancements in the interest of justice." (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1091.) Additionally, "because there is nothing in the amendment to suggest any legislative intent that the amendment would apply prospectively only, we must presume that the Legislature intended the amendment to apply to every case to which it constitutionally could apply . . . ." (*Ibid.*)

B

*On These Facts, Remand Is Appropriate*

A finding that amended sentencing provisions apply retroactively, "is not the end of the matter. We are not required to remand to allow the court to exercise its discretion if 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] . . . enhancement' even if it had the discretion." (*People v. Jones* (2019) 32 Cal.App.5th 267, 272-273.) On the facts of this case, we find no such clear indication and conclude, particularly given defendant had no prior convictions and the enhancements added over 50 years to defendant's sentence, remand is appropriate to allow defendant an opportunity to present his arguments to the trial court for consideration.

19

V

*The Second Degree Murder And Attempted Murder Convictions Are Not Inconsistent*

In a supplemental brief, defendant argues that the jury's findings that (1) defendant was guilty of the second degree rather than first degree murder of Lee, and (2) defendant was guilty of the attempted murder of Thao are logically inconsistent, and therefore, violate his Fourteenth Amendment rights.

Defendant's reasoning is essentially as follows: a first degree murder conviction requires a jury finding of an intent to kill, but a second degree murder conviction does not. To convict a defendant of attempted murder, a jury must find the defendant had a specific intent to kill. Defendant reasons that in finding him guilty of "only second-degree murder" it is "apparent that the jury found that defendant did *not* intend to kill. Otherwise, the jury would have concluded that he was guilty of first-degree murder." As such, defendant reasons, in reaching its conclusions under these facts as to the charges regarding the murder of Lee and the attempted murder of Thao, who were riding in the same vehicle, the jury reached inconsistent conclusions -- that he did not intend to kill Lee, the murder victim, but did intend to kill Thao, the attempted murder victim, and, therefore, defendant was denied his Fourteenth Amendment rights to due process.

This argument is entirely unpersuasive. To begin with, even assuming that the jury did find defendant did not intend to kill Thao but did intend to kill Lee, the verdict would not be inconsistent.

The case defendant relies on for the proposition that two inconsistent guilty verdicts cannot stand, *Masoner v. Thurman* (9th Cir. 1993) 996 F.2d 1003, is of no aid to him. In *Masoner*, the court said, "[w]e hold that a due process challenge to a jury verdict on the ground that convictions of multiple counts are inconsistent with one another will not be considered if the defendant cannot demonstrate that the challenged verdicts are *necessarily logically inconsistent*. If based on the evidence presented to the jury *any rational fact finder could have found a consistent set of facts supporting both convictions*,

20

due process does not require that the convictions be vacated." (*Id.* at p. 1005, italics added.)

Here, a rational trier of fact could have found that the People were able to prove defendant specifically intended to kill the driver of the car (Thao) who would have been closer to him and an easier target for bullets aimed at the driver's side of the car and was thus guilty of the attempted murder of Thao, but did not at the time of the shooting intend to kill the passenger (Lee) and was thus guilty only of second degree murder in the killing of Lee. The second degree murder verdict and attempted murder verdict were not inconsistent.

## DISPOSITION

The case is remanded to allow the trial court to exercise its discretion in light of Senate Bill No. 620's amendments to sections 12022.5, subdivision (c), and 12022.53, subdivision (h). (Stats. 2017, ch. 682, §§ 1-2). The judgment is otherwise affirmed.

/s/_____
Robie, J.

I concur:

/s/_____
Renner, J.

21

Hull, A.P.J.   Concurring and dissenting.

I concur in Parts I, II, III, IV(A), and V of the Discussion.  I dissent as to Part IV(B).

In my view, this record demonstrates that remanding the matter to the trial court to exercise its discretion to reduce defendant's sentence is a needless waste of judicial resources and the attendant other costs of remand including, perhaps most importantly, the likelihood the victims of defendant's violent crimes and their loved ones will want to attend the resentencing thus causing them to re-live the pain of their losses.  Remand is simply not required by the law because " 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] . . . enhancement' even if it had the discretion.  (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.)"  (*People v. Jones* (2019) 32 Cal.App.5th 267, 272-273 (*Jones*).)

"The trial court need not have specifically stated at sentencing it would not strike the enhancement if it had the discretion to do so.  Rather, we review the trial court's statements and sentencing decisions to infer what its intent would have been."  (*Jones*, *supra*, 32 Cal.App.5th at p. 273.)

Prior to sentencing the trial judge received a probation report that stated, in part, as follows:

Regarding Count I of the complaint alleging second degree murder, after noting defendant was statutorily ineligible for a grant of probation and that, even if eligible, he was not a suitable candidate for probation, the report said:  "The defendant used a weapon against particularly vulnerable victims during the commission of the offense.  He was an active participant in the crime.  *This offense was committed in furtherance of a criminal street gang.*  By virtue of his conduct in this case, the defendant has revealed himself to be a violent and dangerous individual who, if not incarcerated, will pose a threat to the community."  (Emphasis added.)

1

Turning to the appropriate sentence for the determinant counts, the report, in addressing the question of aggravation and mitigation, said: "It is noted that defendant has no prior record of criminal convictions. However, the defendant's actions involved great violence and a high degree of callousness. The defendant fired multiple rounds from his moving vehicle toward the victim's moving vehicles. There were at least two other vehicles on the freeway at the time of the shooting, one of which was a taxi transporting passengers. Those innocent motorists were subject to being struck by stray/ricocheted bullets, as well as potentially being injured if the victims lost control of their vehicles due to their injuries. As such, the defendant's actions both endangered and showed a general disregard for the lives of not only the direct victims, but the general public as well. Mr. [T.] and [L.Y.] could be considered particularly vulnerable in that they were the drivers of their respective vehicles and were traveling on the freeway at the time of the shooting. They had limited ability to take evasive action to avoid the shooting or to defend themselves. All of the victims are considered vulnerable in that they had not engaged in a conflict with the defendant prior to the offense and were likely taken by surprise when he began shooting at them. The defendant's decision-making with regard to this matter, *particularly his willingness to shoot strangers based upon perceived disrespect and/or his incorrect assumption they were rival gang members, indicate the defendant presents a serious danger to society if he is not incarcerated. Given these factors, the upper term appears appropriate*." (Emphasis added.)

Prior to the trial court rendering its sentence in this matter, the People argued:

"One of the things that is remarkable about this case is what just an utter waste it is. You have the two primary victims in this case, two young men who were both going to college. Mr. [J.L.] was going to Butte College. Mr. [C.T.] was going to CSUC and doing everything that one would hope a young person would do to better their lives and to make more of themselves.

2

"Neither of those gentlemen have any gang ties, neither of the other two victims have any gang ties. And yet it appears that the loss, obviously, of Mr. [J.L.] is a loss of a very beloved young man. A very promising young man. The injuries that Mr. [C.T.] suffered were very significant. They had a significant disruption of his life where he had to drop out of school and undergo a significant period of rehabilitation.

"And when you look at the harm that the Defendant inflicted, and you have to ask for what? And the bottom-line answer of that is the Defendant made an assumption. He assumed that the people he was shooting at were rival gang members, and he was wrong. And his actions caused -- the significant harm that he has inflicted are now going to bring a significant sentence."

Prior to announcing defendant's sentence and after noting it had read the probation officer's report dated January 21, 2016, the trial court, adopting in whole the statements regarding sentencing set forth in the probation report, said:

"In this matter the Defendant, a documented Hmong National -- excuse me. Hmong Nation Society criminal street gang member, observed the victims sitting in their vehicles in the FoodMaxx parking lot. Video surveillance from the store shows the Defendant driving by the victims' vehicles and waving as he passed them. The Defendant later advised the detectives that he did not recognize the victims and felt that they were looking at him in a disrespectful manner. The Defendant followed the victims onto the freeway, at which time he pulled up next to them and shot several rounds at their vehicles. The driver of one of the vehicles, [C.T.], received a gunshot wound to the face, resulting in a fractured mandible and lacerations. His passenger, [J.L.], was shot in the head and chest. Mr. [T.] was able to continue driving his vehicle to Enloe Hospital in Chico where he underwent surgical intervention to repair his fractured mandible. Efforts to revive Mr. [L.] were unsuccessful, and he ultimately died as a result of the injuries to his brain.

3

"The driver and the passenger of the second vehicle, [L.] and [K.Y.], were uninjured. However, bullets were recovered from both the driver and passenger sides of the vehicle. During the interview with the detectives, Defendant provided various accounts of the events, vacillating between denying any involvement in the shooting, to witnessing the shooting as a bystander, to placing a telephone call to a friend which ultimately resulted in the shooting, to admitting that he perpetrated the shooting. The Defendant opted not to participate, apparently, in the probation review.

"Pursuant to 12022.5(g) and 1203.06(a) (1) of the Criminal Code, the Defendant is statutorily ineligible for a grant of probation, as he personally used a firearm to commit murder.

"Even if the Defendant were eligible for a grant of probation, he would not be considered a suitable candidate. The Defendant used a weapon against particularly vulnerable victims during the commission of the offense. He was an active participant in the crime. The offense was committed in the furtherance of a criminal street gang. *By virtue of his conduct in this case, the Defendant has revealed himself to be a violent, dangerous individual who, if not incarcerated, would be a danger and pose a threat to our community.* (Emphasis added.) ¶ . . . ¶

"In determining the appropriate term of incarceration for the remaining determinant counts, circumstances denying probation in mitigation [*sic*] have been examined pursuant to Rules of Court 4.421 and 4. 423. It is noted the Defendant has no prior record of criminal convictions. However, the Defendant's actions involved great violence and a high degree of callousness. The Defendant fired multiple rounds from his moving vehicle toward the victims' moving vehicles. There were at least two other vehicles on the freeway at the time of the shooting, one of which was a taxi transporting passengers. Those innocent motorists were subject to being struck by stray and ricochetted [*sic*] bullets, as well as potentially being injured if the victims had lost control of their vehicles due to their injuries. As such, the Defendant's actions posed a danger,

4

and showed a general disregard for the lives of not only the direct victims, but the general public as well.

"The drivers of the two cars, Mr. [T.] and [L.Y.], would be considered particularly vulnerable in that they were drivers and were traveling on the freeway at the time of the shooting at a high rate speed. They had a limited ability to take evasive action to avoid the shooting or to defend themselves. All of the victims are considered vulnerable. And none of them had engaged in any conflict with the Defendant prior to the offenses, and were likely taken by surprise when he began shooting at them.

"The Defendant's decision-making with regard to this matter, particularly his willingness to shoot at strangers based upon perceived disrespect, or his incorrect assumption that they were rival gang members, indicate that this Defendant is a danger to society if he is not incarcerated. *Given those factors, an upper term on all the determinant charges appears to be appropriate.*" (Emphasis added.)

Shortly after making these remarks, the trial judge sentenced the defendant to the maximum term allowed under the law: a determinate term of 21 years in prison plus life with a minimum parole eligibility of 65 years.

One must keep in mind the question before us. The immediate question is not whether the trial judge, knowing he or she now has the discretion to do so, would render a different sentence today given the passage of time and and/or factors not before him or her at the time of the original sentencing. After all, if that were the question, in cases such as these we would be required to remand the matter for resentencing no matter what the trial judge said at the time of the original sentencing. If that were the question, the law would basically be sanctioning *two* sentencing proceedings conducted years apart perhaps presenting different circumstances.

Rather, the question is whether " 'the record shows that the trial court clearly indicated when it *originally* sentenced the defendant that it would not in any event have

5

stricken [the] . . . enhancement' even if it had the discretion." (*Jones, supra,* 32 Cal.App.5th at pp. 272-273 (emphasis added).)

Given that which was before the trial court when the defendant was sentenced, and particularly the trial judge's remarks in announcing the judge's sentence, I can only conclude that the record shows that trial judge would not have stricken either or both of the enhancements at issue if he had known he had the discretion to do so.

On this record, I would not remand the matter to the trial court for resentencing.


      /s/_____
      HULL, A.P.J.